**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dong Soon Trisdale, ) | No. CV-06-2187-PHX-MHM |
| )  Plaintiff, ) | |
| ) | **ORDER** |
| v. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

I. Procedural Background

The Plaintiff, Dong Soon Trisdale, filed for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on September 23, 2004. (See Transcript of Administrative Record ("Tr.") 17, 53-56). Her applications were denied both when they were originally filed, and upon reconsideration. (Tr. 27-30; 33-35; 391-94; 399-402). She requested and received a hearing before an administrative law judge ("ALJ"), which was held February 7, 2006. (Tr. 36; 549-79). The ALJ determined that the Plaintiff was not disabled within the meaning of the Social Security Act, and his March 24, 2006 decision became final when the Appeals Council chose not to disturb it. (Tr. 9-11).

The Plaintiff brought the current action for judicial review on September 13, 2006, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3). (Complaint, Dkt. #1). The Plaintiff and the Commissioner of Social Security have brought cross motions for summary judgment. (Dkt.

1  #20; 23).  After consideration of the arguments set forth in the parties' briefs, the record in
2  the case, and the applicable law, the Court issues the following order.
3  II.  Standard of Review
4        The Commissioner's final decision that a claimant is not disabled will be upheld if the
5  findings of fact are supported by substantial evidence in the record as a whole and if the
6  Commissioner applied the proper legal standards.  Magallanes v. Bowen, 881 F.2d 747, 750
7  (9th Cir. 1989).   Substantial evidence is more than a mere scintilla, but less than a
8  preponderance.  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  It is such relevant
9  evidence as a reasonable mind might accept as adequate to support a conclusion.  Id.
10       In determining whether substantial evidence supports a decision, the Court considers
11 the entire record, weighing both the evidence that supports the Commissioner's conclusions
12 and the evidence that detracts from them.  Id.  "If the evidence can reasonably support either
13 affirming or reversing th[at] conclusion, the court may not substitute its judgment for that of
14 the [ALJ]."  Id.  If the evidence is inconclusive, "the questions of credibility and resolution
15 of conflicts in the testimony are functions solely of the [Commissioner]."  Sample v.
16 Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  But if on the whole record before this Court,
17 substantial evidence supports the Commissioner's decision, the Court must affirm it.  See
18 Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); see also 42 U.S.C. § 405(g).
19       To establish eligibility for disability benefits, a claimant must show that (a) she
20       suffers
21 from a medically determinable physical or mental impairment that can be expected to result
22 in death or that has lasted or can be expected to last for a continuous period of not less than
23 twelve months, and (b) considering age, education, and work experience, the impairment
24 renders claimant incapable of performing work she previously performed, and incapable of
25 performing any other kind of substantial gainful work that exists in the national economy.
26 See 42 U.S.C. § 423(d)(1), (2)(A); Reddick, 157 F.3d at 721.
27
28

1  III.  Factual Background

2      A.  Medical History

3      The Plaintiff was involved in a rear-end car accident on September 30, 2002. (Tr. 301). She reported being "shaken" and "surprised," but had no bleeding or broken bones. (Tr. 301). She returned home and used aspirin, Ben Gay, and an ice pack. (Tr. 301). She did not seek treatment at the hospital. (Tr. 301).

    The Plaintiff first sought treatment on October 7, 2002. (Tr. 277). Laura Adler, M.D., examined the Plaintiff and determined that she suffered from slight tenderness in her cervical spine, muscle tightness, and strain. (Tr. 277). An x-ray was performed, and the radiologist noted: (1) possible spasm of the neck; (2) straightening of the lordotic curve[1]; (3) otherwise negative spine films; and (4) some degenerative changes. (Tr. 278).

    The Plaintiff sought treatment from a chiropractor on October 18, 2002. (Tr. 290-300). Dr. Driessche stated that the Plaintiff suffered from a "sprain/strain type injury," involving "both the muscle tissue and the more rigid connective tissues," resulting in "malposition of and dysfunction of the joint complexes of her spine." (Tr. 290). Upon review of the Plaintiff's prior x-rays, he agreed with Dr. Adler's previous finding of degenerative disease in the Plaintiff's spine. (Tr. 298).

    Dr. Driessche recommended that the Plaintiff begin a chiropractic regimen of visits 2-3 times per week for four to six weeks, followed by 1 visit per week for an additional two to four weeks. (Tr. 297). In a follow-up letter, he noted that the Plaintiff had continued progress in virtually every aspect of her recovery, although "she continued to experience discomfort at a level and rate above and beyond" what he would have expected. (Tr. 299). He noted also that the Plaintiff was receiving massage therapy that resulted in continual improvement. (Tr. 299). In December, 2004 (when no longer treating the Plaintiff), Dr. Driessche indicated that he did not believe that the Plaintiff's conditions would impose any limitations for twelve continuous months. (Tr. 304).

---

[1]The radiologist recommended that there be clinical correlation to this finding.

1    On January 6, 2005, the Plaintiff was examined by a doctor who specialized in
2  physical medicine and rehabilitation, Dr. Benjamin Sucher. (Tr. 307). The Plaintiff reported
3  to Dr. Sucher that she used only "over-the-counter preparations such as Tylenol and topical
4  preparations." (Tr. 307). She informed him that she had pain in her lower back, mid-back,
5  and left upper extremity with twitching radiating down to her wrist. (Tr. 307). She also
6  complained of significant difficulty sleeping. (Tr. 307).

7    Dr. Sucher diagnosed the Plaintiff with "cervical thoracic and lumbosacral strain," as
8  well as "very mild lumbar spine osteoarthritis - probably normal for age." (Tr. 309). He
9  noted that the Plaintiff was "[i]ndependent in self-care, can do laundry, cooking, and cleaning
10 . . . [as well as] some TV and reading." (Tr. 308). He concluded that there were no objective
11 findings that would preclude the Plaintiff from full-time regular gainful activity, other than
12 possible restrictions in the amount of weight she could lift because of her "small stature."
13 (Tr. 309).

14   Bronislava Shafran, M.D., specializing in neurology and pain management, saw the
15 Plaintiff on January 19, 2005. (Tr. 332). She reported that the Plaintiff complained of low
16 back pain, as well as pain in her left forearm and wrists. (Tr. 332). She indicated that the
17 Plaintiff claimed to be "compliant with carpal tunnel splints," but noted that she was not
18 wearing them in the office, nor did she have them in her purse. (Tr. 332). The Plaintiff
19 informed Dr. Shafran that she was not taking two of her prescribed medications "because she
20 was 'afraid to get epilepsy' from [them]." (Tr. 332). Under "impressions," Dr. Shafran listed
21 low back pain, peripheral neuropathy, bilateral carpal tunnel syndrome, and "[s]econdary
22 gain." (Tr. 332). Dr. Shafran also stated that the Plaintiff was "upset that I did not consider
23 her disabled." (Tr. 332).

24   John Vivian, M.D., a state agency physician, reviewed the Plaintiff's medical records
25 on May 3, 2005. (Tr. 313-20). He reported that the Plaintiff should be able to sit about 6
26 hours in an 8-hour workday, could occasionally lift 50 pounds, could frequently lift 25
27 pounds, and that she had no postural limitations. (Tr. 314). He did express, however, that
28

1  the Plaintiff had limitations with gross manipulation, fine manipulation, and feeling in skin
2  receptors. (Tr. 316).

3  In May, 2005, the Plaintiff reported to "No Appointment MD" with complaints of pain
4  and limited range of motion when doing yoga and Pilates at the gym. (Tr. 349). The intake
5  form states that the Plaintiff "wants to be able to tell lawyers that the paresthesias are due to
6  [motor vehicle accident] 2 yrs ago." (Tr. 349). The practitioner recommended physical
7  therapy and MRI of the Plaintiff's spine. (Tr. 348).

8  The MRI of the Plaintiff's spine, conducted May 13, 2005, revealed "narrow
9  dimension" of the neural canal between C4 and C6, "additional narrowing due to central disk
10 protrusion at C5 - C6 with cord contact," "narrowing from lateral disk spur at the C5- C6
11 level," and "cervical spondylosis[2] and small central protrusion." The Plaintiff returned to Dr.
12 Shafran on June 30, 2005 to discuss the results of her MRI. (Tr. 323). Dr. Shafran opined
13 that the disc protrusion noted in the MRI likely resulted from the car accident. (Tr. 323).
14 She again diagnosed low back pain, peripheral neuropathy, and bilateral carpal tunnel
15 syndrome. (Tr. 323). She noted that the Plaintiff "may go to Arizona Spine Institute to
16 consider other ways of conservative treatment, also may check different chiropractors." (Tr.
17 323). She advised the Plaintiff to continue using her wrist splints. (Tr. 323).

18 On December 19, 2005, the Plaintiff had an initial consultation with Robert Kearl,
19 M.D., a sleep specialist. (Tr. 360). Dr. Kearl noted that chronic pain appeared to be the
20 major feature of the Plaintiff's sleeplessness, and noted "sleep hygiene abnormalities with
21 a very prolonged time in bed in a sleepless state." (Tr. 360). Dr. Kearl also noted that the

---

[2] Although not apparent from the administrative record, cervical spondylosis is defined by the National Institutes of Health as "abnormal wear on the cartilage and bones of the neck with degeneration and mineral deposits in the cushions between the vertebrae." See National Library of Medicine, Medical Encyclopedia on Cervical Spondylosis, available at http://www.nlm.nih.gov. According to NIH, it can lead to increasing pain in the neck and arm, weakness, and changes in sensation. Id. A previous neck injury can predispose a person to spondylosis, but the major risk factor is aging. "By age 60, 70% of women and 85% of men show changes consistent with cervical spondylosis on x-ray." Id.

- 5 -

Plaintiff was unwilling to consider prolonged time in bed a problem, and had no intention of changing her habits. (Tr. 360). Dr. Kearl also pointed out that there clearly existed "an overtone of litigation here and as long as the patient's case remains active she may not improve from the standpoint of any psychophysiologic contributor to her sleeplessness." (Tr. 360). He recommended that the Plaintiff see a pain specialist, but stated she was averse to his suggestion. (Tr. 360).

On December 30, 2005, the Plaintiff underwent a sleep study. (Tr. 359). Although the Plaintiff's "sleep efficiency" was only 27%, Dr. Kearl found no clinically significant sleep disorder. (Tr. 364). At a follow-up visit, Dr. Kearl noted that the Plaintiff refused to comply with his suggestions, including setting a fixed wake-up time. (Tr. 366). He also noted that "compensation issues seem to be predominating here," and that the clinic had nothing further to offer "if she is unable to comply with simple suggestions." (Tr. 366).

On March 7, 2006, the Plaintiff sought treatment from Pattabi Kalyanam, M.D., a board certified physician in pain management and anesthesiology. (Tr. 499). Based on her MRI, Dr. Kalyanam diagnosed mild degenerative disc disease, mild disc bulge, posterior midline anular tear, narrowing of the neurocanal, lateral disc spur, cervical spondylosis, and small central disc protrusion. (Tr. 499-500). Dr. Kalyanam prescribed a series of injections, a muscle relaxer, and an anti-inflammatory medication. (Tr. 500).

B. Work History

The Plaintiff has a bachelor's degree in dental hygiene from Northern Arizona University. (Tr. 557). She worked as a hygienist in various dental offices prior to her car accident. (Tr. 84-85). She had been "temping" as a hygienist at the time of the accident. (Tr. 567).

The Plaintiff testified at the hearing in front of the ALJ that since her accident, she had taken a couple of classes to become a loan officer. (Tr. 558). She had also tried to work in the field, but the job paid on a commission basis, and she "didn't make any money." (Tr. 559) She also testified that "they keep firing [her]." (Tr. 566). The Plaintiff indicated that

1  she had also tried to work for the Arizona Republic selling newspapers, but was fired because
2  she failed to sell enough. (Tr. 568).

3  When asked what she did all day, the Plaintiff responded that the car accident had led
4  to a court battle, and that she would go to the library to do research and typing. (Tr. 566).
5  She said she was still pursuing a claim based on the accident because the amount awarded
6  in arbitration "was not enough." (Tr. 562). Since her accident, the Plaintiff had completed
7  an Internet Marketing workshop, had won an award for her photography, read, watched
8  television, researched, typed and worked on legal papers, prepared meals, did some cleaning,
9  walked, took public transportation and shopped for food. (Tr. 93; 94; 96; 270; 273).

10  A vocational expert testified in front of the ALJ regarding jobs in the national and
11  local economy that an individual with the Plaintiff's background could perform. The ALJ
12  limited the vocational expert's consideration to unskilled work that would not require the
13  Plaintiff to lift more than 20 pounds occasionally or 10 pounds frequently. (Tr. 574). He
14  also limited the inquiry to jobs that would not require pushing or pulling with her lower
15  extremities, crawling, crouching, climbing, squatting or kneeling. (Tr. 574).

16  Based on her limitations, the expert opined that the Plaintiff could work as a cashier
17  or a receptionist. (Tr. 575). She informed the ALJ that there were 454,000 available cashier
18  jobs in the United States, with 8,400 of those being in Arizona, and 66,500 light receptionist
19  jobs available in the United States, with 1,496 of those in Arizona. (Tr. 575).

20  The ALJ determined that the Plaintiff was not able to perform her past relevant work
21  (working as a hygienist), but could perform one of these other jobs that existed in the
22  economy. (Tr. 23). He found, therefore, that she was not disabled within the meaning of the
23  Social Security Act. (Tr. 23).

24  IV.  Discussion

25  A.  Sequential Evaluation Procedure

26  In order to qualify for disability benefits, an individual must be unable to perform
27  "any substantial gainful activity by reason of [a] medically determinable physical or mental
28  impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); 416.905(a).

The ALJ must use a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Social Security Act. The five steps are:

(1) Is the claimant presently engaged in "substantial gainful activity"?

(2) Does the claimant have a severe medically determinable physical or mental impairment (or combination of impairments) that meets the duration requirement?

(3) Does the impairment meet or equal one of a list of specific impairments described in the regulations?

(4) Does the claimant have residual functional capacity to perform her relevant past work?

(5) Does the claimant's residual functional capacity, age, education, and work experience allow her to make an adjustment to other work?

20 C.F.R. §§ 404.1520(a)(4)(i-v); 416.920(a)(4)(i-v). The claimant has the burden of proof for steps one through four, and the Commissioner has the burden for step five. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

B. Analysis

The Plaintiff has raised eleven issues in her Motion for Summary Judgment.[3] None

---

[3]The Plaintiff asserts that the ALJ stated that she had "at least a high school degree." (Motion for Summary Judgment, Dkt. #20). She responds that she in fact has more than a high school degree. (Id.) A specific finding by the ALJ that the Plaintiff had greater than a high school degree would not have changed the outcome, and so is not relevant to the analysis. 20 C.F.R. Part 404, Subpart P, Appendix 2, Medical Vocational Rule 202.13. The Plaintiff's other assertions include: she has no money for needed decompression treatment; she has been creating oil paintings; she has done some modeling; she can prove that the woman who caused the car accident was not married at the time of the Plaintiff's tort suit against her; and she can prove that she attended high school and college, including the years she graduated and degrees received. (Motion for Summary Judgment, Dkt. #20). None of these assertions has any bearing on the ALJ's finding that the Plaintiff was not disabled.

The Plaintiff also attaches documentation related to the retention of independent medical examiners pursuant to Arizona Rule of Civil Procedure 35, information on the financial cost of sleeplessness, and information about jury verdicts in tort cases involving

- 8 -

of the issues has any bearing on the current review of the ALJ's decision, so the Court will proceed with a determination as to whether the ALJ correctly applied the sequential evaluation procedure, and if his factual findings are supported by substantial evidence.

### 1. Step One

At the first step of the analysis, the ALJ must determine whether the claimant is engaged in substantial gainful activity; if the ALJ finds that she is, she will not qualify as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). The ALJ correctly noted that the Plaintiff had not engaged in substantial gainful activity since the date of her motor vehicle accident. (Tr. 18).

### 2. Step Two

If the ALJ proceeds to the second step, he must determine whether the claimant suffers from a "severe medically determinable physical or mental impairment" (or combination of impairments) that meets the duration requirement imposed by the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). The ALJ determined that the Plaintiff suffered from a severe impairment, resulting from the combination of "degenerative disc disease of the lumbar and cervical spine, mild osteoarthritis and spondylosis at C6-C7, bilateral carpal tunnel syndrome, peripheral neuropathy in her upper extremities, and chronic pain." (Tr. 18).

### 3. Step Three

At Step Three, the ALJ must determine whether the impairment meets or equals one of a list of specific impairments described in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). The ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18). The Court finds that there is substantial evidence to support the ALJ's determination.

---

spine injuries. (Id.) Similarly, this information is not relevant to the ALJ's finding in the instant case.

####  4. Step Four

At the fourth step of the inquiry, the Plaintiff had the burden to show that she could no longer perform her past relevant work. <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 511 (9th Cir. 1987); 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). The ALJ determined that the Plaintiff could not perform her relevant past work as a dental hygienist "because of her subjective complaints of chronic fatigue and pain." (Tr. 21-22). The ALJ therefore proceeded to the final step of the analysis.

#### 5. Step Five

##### a. Residual Functional Capacity

At the final step, the ALJ was required to assess the Plaintiff's residual functional capacity, age, education, and work experience to determine whether she could make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v).

The ALJ determined that the Plaintiff had enough residual functional capacity to engage in unskilled light (or sedentary) work. (Tr. 23). In making this determination, the ALJ considered the medical evidence and clinical findings submitted by the Plaintiff's consultative evaluator, treating chiropractor, and neurologist regarding her back pain. (Tr. 19). He noted that neither the severity nor the extent of the Plaintiff's claimed limitations was supported by the medical evidence in the record. (Tr. 19).

The ALJ also noted that the Plaintiff was no longer wearing her carpal tunnel splints. (Tr. 20). He gave weight to the Plaintiff's admission that she could lift up to twenty pounds, and the fact that she reported no problems with driving, reading, or typing. (Tr. 20). He found that the Plaintiff's claim of debilitating carpal tunnel syndrome was inconsistent with the facts in the record, but gave her the benefit of the doubt — to accommodate her subjective pain complaints — by reducing her residual functional capacity to preclude her from using her upper extremities for work above shoulder level. (Tr. 20).

The ALJ also addressed the Plaintiff's claim that she was disabled by a sleep disorder. (Tr. 20). He indicated that her allegations were not fully supported by the medical evidence, giving weight in particular to the fact that the Plaintiff would not comply with the sleep

specialist's recommendations of seeing a pain specialist and picking a fixed wake-up time. (Tr. 20).

The ALJ pointed out the Plaintiff's non-compliance with recommended treatment options. (Tr. 21). He also pointed to facts in the record demonstrating that the Plaintiff took only over-the-counter pain medications and refused to be treated at a pain clinic. (Tr. 21).

Furthermore, the ALJ noted that the Plaintiff did not stop working as a loan officer or as a salesperson for the Arizona Republic because of her impairments; she stated she was fired because she failed to make commissions and sell sufficient subscriptions. (Tr. 21).

Finally, the ALJ considered the incongruence between the Plaintiff's complaints of disabling fatigue, pain and limitations with her activities and ability to function. (Tr. 21). He noted that the Plaintiff lived alone and was able to care for her house, engage in all self care, and remained independent in her activities of daily living. (Tr. 21). He also considered the fact that the Plaintiff represented herself in her lawsuit relating to the car accident, which involved going to the law library, reading books, researching the law, and typing briefs and memoranda. (Tr. 21). Finally, he noted that the Plaintiff took an award-winning photograph, completed an internet marketing workshop, and participated in yoga and Pilates. (Tr. 21).

Based on these facts, the ALJ determined that the Plaintiff could not perform her past relevant work, but that her residual functional capacity enabled her to perform "unskilled light work." (Tr. 23) The Court finds that substantial evidence in the record supports this decision.

### b. Other Work

A vocational expert testified at the hearing that light unskilled jobs — such as cashier and receptionist positions — existed in sufficient numbers in the national and local economies. (Tr. 573-75). The ALJ determined that an individual with the Plaintiff's vocational characteristics and limitations could perform this unskilled light work. (Tr. 23). Because those jobs existed in significant numbers in the economy, he found the Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 23). There is substantial evidence to support this finding.

In light of the whole record, the Court finds that the ALJ fully considered the relevant evidence and applied the appropriate legal standards. Because his decision is supported by substantial evidence in the record, it must be affirmed. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).

V.  Conclusion

The Court affirms the finding by the ALJ that the Plaintiff is not disabled within the meaning of the Social Security Act. The Court notes, however, that several documents in the record reference the Plaintiff's prior receipt of disability benefits. The Court's decision based on the record before it does not foreclose the Plaintiff's ability to seek benefits on alternate grounds.

Accordingly,

**IT IS ORDERED** denying the Plaintiff's Motion for Summary Judgment (Dkt. #20) and granting the Defendant's Cross-Motion for Summary Judgment (Dkt. #23).

**IT IS FURTHER ORDERED** denying the Plaintiff's Motion for Default Judgment (Dkt. #21), Motion for Reconsideration (Dkt. #30), Second Motion for Reconsideration (Dkt. #32), and Third Motion for Reconsideration (Dkt. #33).

DATED this 26th day of March, 2008.

Mary H. Murguia
United States District Judge

- 12 -